# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Eagle Creek Software Services, Inc.,

       Plaintiff,

    v.

Daniel Jones, Ron Sowers, Daniel Kush
and Digital Desert Resourcing, Inc.,

       Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 14-4925 ADM/FLN

_____

Michael E. Obermueller, Esq., Winthrop & Weinstine, P.A., Minneapolis, MN, on behalf of
Plaintiff.

Kurt Erickson, Esq., Jackson Lewis P.C., Minneapolis, MN, on behalf of Defendants Jones,
Kush and Digital Desert Resourcing Inc.

Ron Sowers, pro se Defendant.

_____

## I.  INTRODUCTION

This matter came before the undersigned United States District Judge on December 22,

2014 on Plaintiff Eagle Creek Software Services, Inc.'s ("Eagle Creek") Motion for a Temporary

Restraining Order ("TRO") [Docket No. 4].  The parties agreed to engage in settlement

discussions assisted by Magistrate Judge Franklin Noel after the TRO hearing, but were unable

to reach an agreement.  See Settlement Conf. Minutes [Docket Nos. 49 and 59].  The Court heard

Defendants Daniel Jones ("Jones"), Daniel Kush ("Kush") and Digital Desert Resourcing Inc.'s

(the "DDR Defendants") Motion to Dismiss [Docket No. 36] on February 20, 2015.  The Court

has considered Ron Sowers' ("Sowers") Motion to Dismiss [Docket No. 21] on the filings of

record.[1]  For the reasons discussed below, Eagle Creek's Motion for a TRO and the DDR

Defendants' Motion to dismiss are granted in part and denied in part.  Sowers' Motion to

Dismiss is denied.

## II. BACKGROUND

Eagle Creek is a Minnesota corporation that provides enterprise software products and

services to a wide range of customers in the United States and Canada.  Pl.'s Mem. Supp. TRO

[Docket No. 5] ¶ 1.  Defendants Jones, Sowers and Kush all worked for Eagle Creek in Arizona.

In early 2013, Jones and Sowers worked on a project designed to increase Eagle Creek's

business from Information Technology ("IT") customers in Arizona.  Compl. [Docket No. 1-1] ¶

17.  The business plan became known as the Arizona Digital Desert Resourcing model ("DDR

Model").  The DDR Model sought to create new business opportunities for Eagle Creek by

developing public-private partnerships between leading Arizona corporations, local government

agencies and Arizona's higher education institutions.  Id. ¶ 18.  Specifically, the DDR Model

sought to create an "on shore" alterative for companies' IT needs by utilizing talented IT

students from Arizona universities.  Eagle Creek had implemented a similar training model in

North and South Dakota.  Id. ¶ 25.  In short, the DDR Model was designed to create more jobs in

Arizona, provide high quality IT work to local companies, and expose IT students in Arizona to

specialized, on-the-job training.  Id. ¶¶ 19-20.

By mid-2014, Jones, Sowers and Kush were at odds with Eagle Creek management about

how to move forward with the DDR Model.  Id. ¶¶ 33-37.  Eagle Creek believed that the project

---

[1] Sowers requested that the Court call him on the day of the hearing so that he could participate telephonically.  The Court attempted to reach Sowers by phone twice on the day of the hearing.  There was no answer or voice messaging system at the number he provided.

was consuming too much time, resulting in the neglect of other work.  Id.  Jones, Sowers and Kush wanted Eagle Creek to start a separate business solely dedicated to the DDR Model.  Eagle Creek refused and in July 2014, Jones, Sowers and Kush resigned from Eagle Creek and founded a new company called "Digital Desert Resources, Inc." ("DDR").  Id. ¶¶ 38-45.  Eagle Creek brought suit against Jones, Sowers, Kush and DDR in December 2014 on ten counts: (1) breach of confidentiality and non-disclosure agreement; (2) Jones' breach of employment agreement; (3) Sowers' breach of employment agreement; (4) conversion; (5) breach of common law duty of loyalty; (6) Jones' and Sowers' breach of common law duty of confidentiality; (7) violation of the Minnesota Trade Secret Act; (8) misappropriation; (9) unfair competition; and (10) unjust enrichment.[2]  Compl. ¶¶ 47-139.

## A.  Jones' employment contract

Jones started working for Eagle Creek in 2004 as the Regional Vice President of Eagle Creek's Western Territory.  Compl. ¶ 10.  Jones' duties included creating, developing and implementing strategic growth plans in the Western Territory.  Jones' employment contract included non-competition, non-disclosure, non-solicitation, and arbitration provisions.  Specifically, Jones agreed to "devote his work efforts to the performance of this Agreement and will not, without the Employer's prior written consent, . . . engage in other business activities that would materially interfere with the performance of his duties . . . ."  See Compl. at 36-39 ("Jones Agreement") ¶ 2.[3]  Jones also agreed to not compete directly with Eagle Creek during his

---

[2] Eagle Creek's Complaint mistakenly labels count 6 as "Count V," resulting in a total of only nine named counts rather than ten.

[3] Jones' employment contract with Eagle Creek is attached to the Complaint [Docket No. 1-1] at pages 36-39.

term of employment or "take any action without the Employer's prior written consent to establish, form, or become employed by a competing business on termination of employment by the Employer." Id. ¶ 3. The language of Jones' agreement prohibits him from disclosing trade secrets and confidential information for two years after termination of his employment. Id. ¶ 14.

## B. Sowers' employment contract

Sowers started working for Eagle Creek in 2012 as an Account Relations Manager, reporting directly to Jones. Sowers' employment contract includes a restrictive covenant, provisions related to non-disclosure of confidential information, injunctive relief and a forum selection clause specifying Minnesota as the litigation venue for any actions arising out of the contract. See Compl. at 41-45 ("Sowers Agreement").[4] Confidential information is defined by the contract as "any information or compilation of information not generally known which is proprietary to Employer, including, without limitation, trade secrets, financial information, and information relating to products, processes, methods, pricing, marketing and customer information." Id. ¶ 5. Sowers' agreement prohibits him from disclosing confidential information without written permission from Eagle Creek during his employment and "at all times thereafter." Id.

Sowers also agreed that all inventions are the property of Eagle Creek. Inventions are defined in the contract as:

> [D]iscoveries, improvements, and ideas (whether in writing or reduced to practice) and works of authorship, whether patentable or copyrightable (1) which relate directly to the Company's business or its actual or demonstrably anticipated research or development; (2) which result (or resulted) from any work performed by the

---

[4] Sowers' employment contract with Eagle Creek is attached to the Complaint [Docket No. 1-1] at pages 41-45.

Employee for the Company, (3) for which the Employee utilizes the Company's equipment, supplies, facilities, Confidential Information, or Company Product or (4) which were developed during the Employee's employment relationship with the Company.

Id. ¶ 6.  Sowers' restrictive covenant states that for one year he "shall not, directly or indirectly, for himself or others, individually, jointly or as a partner . . . contact or seek to do business with any client of the Employer on whose accounts Employee worked at any time during Employee's employment . . . ."  Id. ¶ 8.1.

## C.  Kush's confidentiality and non-disclosure agreement

Kush was a prospective business consultant introduced to Eagle Creek by Jones in January 2014.  Kush signed a Confidentiality and Non-Disclosure Agreement with Eagle Creek. See Compl. at 33-34 ("Kush Agreement").[5]  Kush agreed that confidentiality and non-disclosure obligations survive for 5 years after termination of the agreement.  Id. ¶ 4.  Confidential information is defined in Kush's contract as:

> [A]ll information or materials, documents, data, plans, programs, specifications, techniques, processes, policies, both written and oral, of a secret, confidential or proprietary nature, including without limitation any and all information relating to Eagle Creek's business model, employees and candidates, recruiting and retention methods, marketing methods, employee pay rates, financial information, forecasts, clients and potential clients, client bill rates, and any related information thereto (collectively "Confidential Information").

Id. ¶ 1.

## III.  DISCUSSION

## A.  Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to

---

[5] Kush's confidentiality and non-disclosure agreement with Eagle Creek is attached to the Complaint [Docket No. 1-1] at pages 33-34.

dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P.

12(b)(6).  In considering a motion to dismiss, the pleadings are construed in the light most

favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.

Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994) (citation omitted).  However, the factual

allegations must "raise a right to relief above the speculative level," and push claims "across the

line from conceivable to plausible."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In

other words, the complaint must establish more than a "sheer possibility that a defendant has

acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  Id. at 679.  In doing so,

the court must draw reasonable inferences in the plaintiff's favor, but it need not make

unreasonable inferences or accept unrealistic assertions.  See Brown v. Medtronic, Inc., 628 F.3d

451, 461 (8th Cir. 2010).

**B.  Personal Jurisdiction**

Sowers and DDR challenge the Court's jurisdiction.[6]  Sowers argues that the forum

selection clause included in his employment contract is "unenforceable" because it was signed

under "extraordinary and unconscionable" circumstances.  DDR argues that it lacks sufficient

contacts with Minnesota and should be dismissed from this action.  Defendants argue that the

forum selection clause in Sowers' contract is valid and that the Court's jurisdiction over DDR is

proper because DDR's owners—Jones and Kush—act as DDR's agents and have sufficient

minimum contacts with Minnesota.

---

[6]  Defendants Jones and Kush accede that the Court has personal jurisdiction.

A non-moving party need only make a prima facie showing of jurisdiction to survive a motion to dismiss. Bell Paper Box v. U.S. Kids, 22 F.3d 816, 818 (8th Cir. 1994). Federal courts acting on a diversity action may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause. Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991). The Minnesota Supreme Court has extended maximum extraterritorial effect to Minnesota's long-arm statute. B.F. Goodrich Co. v. Auxitrol S.A., 2001 U.S. Dist. LEXIS 21165, *10 (D. Minn. Nov. 30, 2001). The long-arm statute requires a defendant have minimum contacts with the forum state unless the party otherwise agrees to the jurisdiction of the forum state. Id. Minimum contact with the forum state must reveal "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 464, 474-477 (1985). Absent minimum contacts, due process "is satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause." St. Paul Fire & Marine Ins. Co. v. Courtney Enters., 270 F.3d 621, 624 (8th Cir. 2001) (citing Dominium Austin Partners, L.L.C., v. Emerson, 248 F.3d 720, 726 (8th Cir. 2001)). A forum selection clause is enforceable unless it is invalid or enforcement would be unreasonable and unjust. Capsource Fin., Inc. v. Moore, 2012 U.S. Dist. LEXIS 88618, *9 (D. Minn. June 27, 2012).

Sowers argues that his employment contract is unconscionable because he worked for Eagle Creek for seven months, unpaid, before he was offered an employment contract. Sowers argues that he could not abandon his seven month investment in Eagle Creek, but Sowers does not allege that he was coerced to work for free, nor that he was pressured to sign the employment

contract. Thus, there are no facts that support the conclusion that Sowers' employment contract was unreasonable or otherwise unjust. Because the forum selection clause included in Sowers' employment contract is valid and enforceable, this Court has personal jurisdiction over Sowers.

DDR maintains that it is an Arizona company with no Minnesota contacts. DDR does not do business in Minnesota, nor is it licensed to do so. Nevertheless, Eagle Creek argues that the minimum contacts of its agents—Jones and Kush— establish jurisdiction over DDR. Eagle Creek cites Personalized Brokerage Serv., LLC v. Charles Luicius, et al., in support of its argument that this Court has personal jurisdiction over DDR. 2006 WL 208781, *3 (D. Minn. Jan. 25, 2006). That case is distinguishable, however, because the owners of the foreign corporation pursued business in Minnesota, contracted with Minnesota insurance agents, and had other contacts with Minnesota. Id.

Eagle Creek argues that Jones and Sowers used Eagle Creek's e-mail system—the server of which is in Minnesota—to establish DDR, Inc. Jones and Kush resigned from Eagle Creek in July 2014 and incorporated DDR, Inc. in August 2014, which means that any contacts they had with Minnesota were undertaken in their capacity as Eagle Creek employees, not as owners of DDR. Eagle Creek does not specifically contend that Jones and Kush had contact with Minnesota for the purpose of promoting DDR in Minnesota or establishing business contacts in Minnesota. See Jarvis & Sons, Inc. v. Freeport Shipbuilding & Marine Repair, Inc., 966 F.2d 1247, 1250 (8th Cir. 1992) (affirming District Court's finding that it lacked personal jurisdiction over defendant corporation because corporation had "no office or agent or representative or employees in Minnesota; none of defendant's employees has ever visited Minnesota in connection with the contract."). There is no evidence that DDR has purposefully availed itself of

any privilege or protection in Minnesota such that it would "reasonably anticipate being haled into court" in Minnesota. <u>Burger King Corp.</u> 471 U.S. at 474.

Finally, Eagle Creek contends DDR is subject to this Court's jurisdiction under the "conspiracy theory" which requires (1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries.  This argument fails because the creation of DDR was the purpose of the alleged conspiracy between Jones, Kush and Sowers.  DDR thus could not agree to participate in the conspiracy and the overt acts highlighted by Eagle Creek are acts undertaken by the individual defendants before DDR was even incorporated.  For these reasons, the Court lacks personal jurisdiction over DDR and it is dismissed from this suit.

**C.  Jones and Kush's Motion to Transfer[7]**

Jones and Kush argue this matter should be transferred to Arizona.  A district court may transfer any civil action to any other district "[f]or the convenience of parties and witnesses, [and] in the interest of justice . . . ."  28 U.S.C. § 1404.  The party seeking the transfer bears the burden of establishing that the transfer should be granted under the statute.  <u>Nelson v. Bekins Van Lines Co.</u>, 747 F. Supp. 532, 535 (D. Minn. 1990).

**1.  Convenience of the parties and witnesses**

Both parties claim their preferred forum is more convenient for the parties and witnesses in this case.  To carry their burden, Defendants must show that their inconvenience "strongly" outweighs the inconvenience Eagle Creek would suffer if the case were transferred to Arizona.

---

[7] Sowers has not moved to transfer this case to Arizona.  <u>See</u> Mot./Mem. Supp. Mot. Dismiss [Docket No. 21].

9

Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3rd Cir. 1970), cert. denied., 401 U.S. 910, 91 S.

Ct. 871, 27 L. Ed. 2d 808 (1971).

Defendants have not met their burden here.  A transfer should not be granted if the effect

is to merely shift the inconvenience from one party to the other.  Van Dusen v. Barrack, 376 U.S.

612, 646, 84 S. Ct. 805, 824, 11 L. Ed. 2d 945 (1964).  Although the Defendants reside in

Arizona, Eagle Creek has identified several witnesses who reside in Minnesota.  As such,

transferring the case to Arizona would simply shift the inconvenience cited by Defendants to

Eagle Creek.

**2.  Interests of justice**

The interests of justice is the most important § 1404(a) factor.  Radisson Hotels Int'l v.

Westin Hotel Co., 931 F. Supp. 638, 641 (D. Minn. 1996).  When considering transfer of a

lawsuit to another district in the interest of justice, courts consider the following:

> (1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to
> the parties of litigating in each forum, (4) each party's ability to enforce a judgment,
> (5) obstacles to a fair trial, (6) conflict of laws issues, and (7) the advantages of
> having a local court determine questions of law.

Terra Int'l, Inc. v. Miss. Chem. Corp., 119 F.3d 688, 696 (8th Cir. 1997).  None of these factors

weigh in favor of Defendants' motion to transfer.  This Court has already heard a Motion for a

TRO, a Motion to Dismiss, and the parties have engaged in settlement talks with Magistrate

Judge Franklin Noel.  Judicial economy and preserving the parties' resources is best served by

retaining the case in this District.  Further, the contracts of all three individual Defendants include

a choice of law provision specifying that Minnesota law shall be applied to any dispute arising

from their contracts, and Kush and Sowers' agreements include a forum selection clause

identifying Minnesota as the forum for litigation.  Kush's Agreement ¶ 7; Jones' Agreement ¶ 18;

Sowers' Agreement ¶ 13.  In sum, the interests of justice considerations support deferring to

Eagle Creek's choice of forum in this case.  The DDR Defendants' Motion to Transfer is denied.

**D.  DDR Defendants' Motion to Compel Arbitration**

DDR Defendants argue that all claims should be compelled to arbitration based on the

arbitration clause in Jones' employment contract.  Eagle Creek argues that Jones has forfeited his

right to demand arbitration and, in the alternative, Jones is in default of the arbitration clause in

his contract.

The arbitration and notice provisions in Jones' employment contract state, in relevant part:

> Any controversy or claim arising out of or relating to this Agreement will be settled
> by arbitration in accordance with the Commercial Arbitration Rules of the American
> Arbitration Association, and judgment on the award rendered by the arbitrators may
> be entered in any court having jurisdiction.
>
> * * *
>
> Any notice to the Employer required or permitted under this Agreement will be given
> in writing to the Employer, either by personal service or by registered or certified mail
> . . . addressed to Kenneth C. Behrendt . . . .

Jones' Agreement ¶¶ 16, 19.  Eagle Creek argues that despite several months of litigation, Jones

has not initiated arbitration proceedings in accordance with the Commercial Arbitration Rules of

the American Arbitration Association Rules ("AAA Rules") or given proper notice to Eagle

Creek of  his intent to arbitrate this dispute.  Jones maintains that he raised the issue of

compelling arbitration from the start of this litigation, arguing in his memorandum opposing

Eagle Creek's Motion for a TRO "[i]f this Court does have jurisdiction over Jones; and if it does

not transfer venue to Arizona, then the Court should compel Plaintiff's claims against Jones into

arbitration."  Defs.' Mem. Opp. Pl.'s Mot. TRO [Docket No. 13] at 21.[8]

The Federal Arbitration Act ("FAA") provides that any arbitration agreement within its scope "shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  The FAA mandates that district courts *shall* direct parties to arbitrate where (1) a valid agreement to arbitrate exists and (2) the agreement encompasses the issue in dispute.  Pro Tech Indus. v. URS Corp., 377 F.3d 868, 870 (8th Cir. 2004) (citing Gannon v. Circuit City Stores, Inc., 262 F.3d 677, 680 (8th Cir. 2001)).  Whether a party has waived its right to arbitrate a dispute is a procedural question of arbitrability, which the Eighth Circuit has consistently held should be decided by an arbitrator, not a judge.  "The presumption is that the arbitrator should decide 'allegations of waiver, delay, or a like defense to arbitrability.'"  Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002); see also Int'l. Ass'n of Bridge, Structural, Ornamental, & Reinforcing Ironworkers, Local 493 v.

_____

[8] At the February 20, 2015 hearing on Defendants' Motion to Dismiss, Jones argued that he could not proceed with arbitration absent a court order.  However, court ordered and contractual arbitrations are distinguished in parts (a) and (b) of Rule 4.  The plain language of Rule 4(a) allows a party to an arbitration contract to demand arbitration without a court order:

> (a) Arbitration under an arbitration provision in a contract shall be initiated by the initiating party ("claimant") filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration.

> (b) Arbitration pursuant to a court order shall be initiated by the initiating party filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of any applicable arbitration agreement from the parties' contract which provides for arbitration.
> . . .

AMERICAN ARBITRATION ASSOCIATION, COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES 11 (2013), *available at*: https://www.adr.org/commercial.

EFCO Corp., 359 F.3d 954, 957 (8th Cir. 2004) (noting "the question of whether the procedural prerequisites have been complied with or . . . waived . . . is a matter for the arbitrator and not for the court"); Dominium Austin Partners, 248 F.3d at 728 (holding that question of whether right to arbitration was waived is for arbitrator to decide); Contracting Northwest, Inc. v. City of Fredericksburg, 713 F.2d 382, 386 (8th Cir. 1983) (ruling that the court would not entertain an objection that the opposing party failed to deliver an arbitration demand within the time limit).

Here, the parties do not dispute that the arbitration clause at issue falls under the FAA, is valid, and encompasses the issues in dispute. Eagle Creek's opposition to arbitration is based solely on waiver and delay arguments: "[J]ones . . . has failed to file a demand for arbitration with the AAA regarding these claims. . . . Jones is in default under the express requirements of the arbitration provision contained in the parties' employment agreement, and the AAA commercial arbitration rules incorporated therein." Pl.'s Mem. Opp. Defs.' Mot. Dismiss [Docket No. 52] 19. Waiver and delay are questions of procedural arbitrability that, under Eighth Circuit precedent, must be decided by an arbitrator, not the Court. Thus, Jones' Motion to Compel Arbitration is granted.[9]

**E.  Eagle Creek's Motion for Preliminary Injunction**

As discussed above, DDR is dismissed from this suit based on a lack of minimum contacts with Minnesota and Eagle Creek's claims against Jones are compelled to arbitration. Based on the arbitration clause included in Jones' employment agreement, it is inappropriate for the Court

---

[9] To the extent Defendants seek to compel Eagle Creek to arbitrate claims against the remaining Defendants, the motion is denied. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960).

to rule on Eagle Creek's Motion for a TRO as it would apply to Jones.  A preliminary injunction may only be granted in a case subject to arbitration where "the contract terms contemplate such relief and it can be granted without addressing the merits." RSM McGladrey, Inc. v. Epp, 2011 U.S. Dist. LEXIS 47548, *3 (D. Minn. 2011) (citations omitted).  The arbitration clause in Jones' contract does not include language that contemplates a court granting injunctive relief proceeding arbitration.  Compare Manion v. Nagin, 255 F.3d 535, 538 (8th Cir. 2001) (denying injunctive relief where arbitration clause lacked "qualifying contractual language" entitling moving party relief), with Peabody Coalsales Co. v. Tampa Elec. Co., 36 F.3d 46, 47, n.3 (8th Cir. 1994) (granting injunctive relief where parties' agreement stated "performance of [the parties'] respective obligations under this Agreement shall be continued in full by the parties during the dispute resolution process . . . .").  The Court will therefore proceed with analyzing Eagle Creek's motion for a TRO as it would apply to Kush and Sowers only.

**1. Standard of Review**

A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety. Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).  The court considers four factors in determining whether a preliminary injunction should be granted:  (1) the threat of irreparable harm to the movant in the absence of relief, (2) the balance between the harm alleged and the harm that the relief may cause the non-moving party, (3) the likelihood of the movant's ultimate success on the merits, and (4) the public interest. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  No single factor is determinative. Id. at 113.  Instead, the court considers the particular circumstances of each case, cognizant that the primary question is whether the "balance of equities so favors the movant that justice requires the

14

court to intervene to preserve the status quo until the merits are determined."   Id.

### 2. Threat of Irreparable Harm

Irreparable harm is a threshold requirement for preliminary injunctive relief.   Gelco Corp.
v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).   Threat of irreparable harm requires more
than a possibility of remote future injury, it requires a presently existing actual threat of injury.
Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982).   "Wholly speculative" harm will not justify
injunctive relief.   Local Union No. 884, United Rubber Workers, Cork, Linoleum & Plastic
Workers v. Bridgestone / Firestone, 61 F.3d 1347, 1355 (8th Cir. 1995).   "Irreparable harm occurs
when a party has no adequate remedy at law, typically because its injuries cannot be fully
compensated through an award of damages."   Rogers Grp, Inc. v. City of Fayetteville, Ark., 629
F.3d 784, 789 (8th Cir. 2010) (quotations omitted).

Irreparable harm may be inferred from the breach of a valid and enforceable restrictive
covenant.   Merrill Corp. v. R.R. Donnelley & Sons, Co., 2008 U.S. Dist. LEXIS 58380, *12 (D.
Minn. Aug. 1, 2008) (citing Alside, Inc. v. Larson, 220 N.W. 2d 274, 278 (Minn. 1974)).   Further,
injunctive relief clauses included in employment and non-compete agreements support an
inference of irreparable harm.   Ticor Title Ins. Co. v. Cohen, 173, F.3d 63, 68 (2nd Cir. 1998)
(noting that an injunctive relief clause "might arguably be viewed as an admission . . . that
plaintiff will suffer irreparable harm . . . .").

In this case, both Sowers and Kush's agreements have injunctive relief provisions.
Sowers' employment agreement states:

> The parties recognize that irreparable damage will result to Employer if Employee
> violates or threatens to violate the terms of Sections 5 or 8 (including all subsections),
> and that the damages would be difficult to prove and quantify, and it is therefore
> agreed that, in the event of a breach or threatened breach . . . Employer shall be

15

entitled to injunctive relief . . . .

Sowers Agreement ¶ 10.  Similarly, Kush's confidentiality and non-disclosure agreement states:

> Receiving Party agrees and acknowledges that Eagle Creek will be irreparably harmed and not have an adequate remedy at law for the breach or threatened breach by Receiving Party of this Agreement.  Eagle Creek may, in addition to but not a substitute for the other remedies which may be available to it in either at law or in equity, file a suit in equity to temporarily, preliminarily and/or permanently enjoin Receiving Party from the breach or threatened breach of such covenants. . . . .

Kush Agreement ¶ 5.  These provisions strongly support Eagle Creek's request for injunctive relief.

In addition, Sowers' non-compete clause states:

> During Employee's employment and for a period of one (1) year immediately following the termination of Employee's employment (the "Non-Competition Term"), regardless of the reason for or circumstances of such termination, Employee shall not, directly or indirectly, for himself or others, individually, jointly or as a partner, employee, agent or otherwise contact or seek to do business with any client of the Employer on whose accounts Employee worked at any time during Employee's employment, or any other client for which the Employer is performing services at the time of Employee's termination of employment and which are identified in writing for the employee at such time.

Sowers Agreement ¶ 8.1.  Because Sowers resigned from Eagle Creek in July 2014, he is bound by his one year non-compete clause until July 2015.  Kush's agreement included a five-year confidentiality and non-disclosure commitment, which began in July 2014 and continues until July 2019.  Neither Sowers or Kush challenge the validity of the injunctive relief or non-compete provisions included in their respective agreements with Eagle Creek.  In short, the unambiguous terms of Sowers and Kush's agreements with Eagle Creek support granting injunctive relief.

In addition, the record evidence supports the conclusion that Jones, Sowers and Kush's new business is causing irreparable harm to Eagle Creek.  Eagle Creek argues that DDR is using Eagle Creek's confidential information to actively market to Eagle Creek's prospective partners and customers using the DDR Model owned by Eagle Creek.  DDR is capitalizing on the

goodwill and customer relationships because Jones, Kush, and Sowers are implementing the DDR

Model they designed as Eagle Creek employees.  In accordance with the terms of the employment

contracts, Eagle Creek owns the DDR Model.  <u>See</u> Kush Agreement ¶ 3 (". . . Confidential

Information is the exclusive property of the Eagle Creek."); Sowers Agreement ¶ 6 (". . . all

inventions . . . are the [Eagle Creek's] sole and exclusive property. . . . ").  Under these

circumstances, Eagle Creek correctly asserts that calculating the amount of monetary damages as

a result of Sowers and Kush's prohibited use of confidential information will be difficult, if not

impossible.  Injunctive relief is therefore appropriate.  <u>Metro Sports Facilities Comm'n v. Minn.</u>

<u>Twins P'ship</u>, 638 N.W. 2d 214, 223 (Minn. Ct. App. 2002) (holding that where there is difficulty

determining damages, "it may be far better to prevent injury through a temporary injunction than

to attempt to compensate the injured party after the injury has occurred.").

### 3.  Likelihood of Success on the Merits

The terms of Sowers and Kush's agreements with Eagle Creek strongly support the

conclusion that Eagle Creek will prevail, at a minimum, on the merits of their contract-based claims.

#### a.  Eagle Creek's claims against Sowers

Eagle Creek is likely to prevail on the merits of its claims against Sowers based on the

non-compete and confidentiality commitments he made in his employment agreement.  Valid

non-compete agreements are enforced in Minnesota to the extent necessary to protect legitimate

business interests.  <u>Satellite Indus. Inc., v. Keeling</u>, 396 N.W.2d 635, 639 (Minn. App. 1986).  To

be valid, non-competition agreements must be reasonable in scope and supported by sufficient

consideration.  <u>Overhold Crop Ins. Serv. Co. v. Bredeson</u>, 437 N.W.2d 698, 703-04 (Minn. Ct.

App. 1989).  When a restrictive covenant is agreed to at the start of employment, as in this case,

no further consideration is necessary.  Nat'l Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 740

(Minn. 1982).  Sowers' non-compete is reasonable because it is only for one year and is limited to

clients he either served or learned of while at Eagle Creek.  See Alside, 220 N.W. 2d at 280

(finding two-year restriction reasonable).

###### b.  Eagle Creek's claims against Kush

Eagle Creek is also likely to prevail on the merits against Kush for breaching his

confidentiality and non-disclosure agreement.  Kush agreed to not disclose confidential

information  he learned while working for Eagle Creek for five years after his termination.  The

DDR Model being implemented by DDR is owned by Eagle Creek.  As a proprietary program,

the DDR Model is included in the contractual definition of Confidential Information.  Thus, there

is very strong evidence that Kush is violating his non-disclosure agreement.

#### 4.  Balance of Harms and the Public Interest

The balance of harms and the public interest factors also weigh in favor of Eagle Creek.

Eagle Creek's multi-year investment in the DDR Model, already implemented in North and South

Dakota, is greater than Sowers and Kush's investment in DDR, established less than one year ago,

in August 2014.  Additionally, the contracts signed by Sowers and Kush are valid and enforceable

and public policy generally favors enforcing contracts.  Benfield, Inc. v. Moline, 351 F. Supp. 2d

911, 919 (D. Minn. 2004).

### IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.      Defendant Sowers' Motion to Dismiss [Docket No. 21] is **DENIED**.

2.   Defendants Jones, Kush and DDR's Motion to Dismiss [Docket No. 36] is
     **GRANTED in part** and **DENIED in part**, as follows:

   A.   To the extent Jones seeks to compel arbitration, the motion is **GRANTED**.
        Jones shall submit documentation to the Court that demonstrates he has
        initiated the arbitration process in accordance with the terms of his contract
        within ten (10) days of the entry of this order.  Failure to initiate the
        arbitration process will constitute a waiver of the arbitration provision
        included in Jones' employment contract;

   B.   DDR's motion for dismissal based on lack of personal jurisdiction is
        **GRANTED**;

   C.   Kush's motion to transfer his claims to Arizona or compel to arbitration is
        **DENIED**.

3.   Eagle Creek's Motion for a Temporary Restraining Order [Docket No. 4] is
     **GRANTED in part** and **DENIED in part**, as follows:

   A.   Eagle Creek's motion for an injunction against Defendants Jones and DDR
        is **DENIED**;

   B.   Eagle Creek's motion for an injunction against Defendants Kush and
        Sowers is **GRANTED**, as follows:

        i.    Defendants Kush and Sowers are hereby restrained from
              violating the terms of their respective agreements with Eagle
              Creek;

        ii.   Defendants Kush and Sowers must cease communications
              with the trade groups, workforce development centers,
              colleges and corporate partners that the DDR Model
              targeted;

        iii.  Kush and Sowers shall, within five days of the entry of this
              order, identify all material that falls under the definition of
              Confidential Information as defined in their respective Eagle
              Creek contracts—whether in electronic, paper or other
              form—and deliver a copy to Eagle Creek;

        iv.   Inform Eagle Creek of each computer and electronic storage
              device that has come into contact with Eagle Creek's
              confidential information;

      v.       Inform Eagle Creek of the location and password information for each computer and electronic device that has come into contact with Eagle Creek's Confidential Information;

      vi.     Identify each individual or company to whom they have disseminated some or all of the Confidential Information.

4.     The parties shall conduct expedited discovery as follows:

    A.     Defendants shall respond to Interrogatories, Document Requests, Requests for Admissions or Demands for Inspection within fifteen (15) calendar days of service of the discovery request;

    B.     Deposition discovery may commence immediately and Defendants shall make witnesses within their control available for deposition within twenty (20) working days' notice.

5.     Expedited discovery shall be limited to the following topics, unless the parties agree otherwise:

    A.     The misappropriation, disclosure and use of Eagle Creek's proprietary, trade-secret and confidential information and the location(s) where such information exists today;

    B.     Sowers and Kush's violations of their respective contracts;

    C.     The extent of efforts made by Defendants to use or market the DDR Model or any of its components; and

    D.     Sowers and Kush's recruitment of Eagle Creek employees.

6.     Eagle Creek shall not be required to post a bond or other security.  Eagle Creek has, at a minimum, shown a high likelihood of success on its contract-based claims against Defendants Kush and Sowers.  <u>Country Inns & Suites by Carlson, Inc. v. 3AM, LLC</u>, 2014 U.S. Dist. LEXIS 151462 *8 (D. Minn. Oct. 24, 2014) (holding that no bond required where plaintiff showed high likelihood of success on the merits).  In addition, Defendant Sowers agreed that no bond or other security would be necessary in the event Eagle Creek sought an injunction.  <u>See</u> Sowers' Agreement ¶ 10.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 10, 2015.